AO 91 (Rev. 11/11)  Criminal Complaint

ORIGINAL

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

STEPHEN ANDREW WALTER,
    also known as "Stevie,"

Defendant.

Case No.

FILED
CLERK, U.S. DISTRICT COURT

SEP 2 0 2019

CENTRAL DISTRICT OF CALIFORNIA

19MJ03988

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of September 4, 2018, in the county of Los Angeles in the Central District of California, the defendants violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute, and Possess with Intent to Distribute, a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Tommy S. Fung, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Sept. 20, 2019

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Matthew J. Jacobs, (213) 894-2213

## AFFIDAVIT

I, Tommy S. Fung, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

45. This affidavit is made in support of a criminal complaint and arrest warrant against STEPHEN ANDREW WALTER, also known as "Stevie" ("WALTER"), for violating 21 U.S.C. § 846 (conspiracy to distribute, and possess with intent to distribute, a controlled substance).

46. This affidavit is also made in support of an application for a warrant to search:

      a.   the person of WALTER, as described more fully in Attachment A-1;

      b.   the premises located at 1440 Veteran Avenue, Apartment 320, Los Angeles, California, 90024 ("WALTER'S RESIDENCE"), as described more fully in Attachment A-2; and

      c.   a 2013 Mercedes Benz S550 with California license plate 7XVK141 and vehicle identification number WDDNG7DBXDA529029 registered to WALTER at 4875 West 133rd Street, Hawthorne, California, 90250 ("WALTER'S CAR"), as described more fully in Attachment A-3;

47. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.

Attachments A-1, A-2, A-3, and B are incorporated herein by reference.

48. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in draft form, in substance and in part only.

## II. BACKGROUND OF AFFIANT

49. I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been since May 2012. I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") division in the Los Angeles HIDTA Office. Additionally, I am a member of the HIDTA Fusion Task Force, which is tasked with, among other responsibilities, investigating suspected opioid-related overdose deaths in Los Angeles County.

50. As an SA, I have received 16 weeks of specialized training in Quantico, Virginia pertaining to drug trafficking, money laundering, undercover operations, and electronic and physical surveillance. Throughout my career as a federal agent, I have interviewed narcotics users, buyers, sellers, manufacturers, transporters, and informants, and I have

discussed with them, and with other law enforcement officers, the methods drug traffickers use to safeguard their drugs and illicit proceeds and to avoid law enforcement detection.

### III. SUMMARY OF PROBABLE CAUSE

51.  As discussed below, evidence shows that on September 7, 2018, 26-year-old Malcom James McCormick died of a drug overdose -- specifically a mixed drug toxicity involving fentanyl, cocaine, and ethanol.  In McCormick's home, law enforcement found evidence that McCormick snorted counterfeit oxycodone pills containing fentanyl shortly before his death.

52.  As discussed below, evidence further shows that two days before his death, in the early morning hours of September 5, 2018, CAMERON JAMES PETTIT ("PETTIT") delivered McCormick counterfeit oxycodone pills containing fentanyl, which PETTIT obtained from WALTER, through WALTER's drug courier REAVIS.[1] After McCormick's death, WALTER continued to sell PETTIT drugs, including through REAVIS.  WALTER resides at WALTER'S RESIDENCE and uses WALTER'S CAR.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    The Arrest of PETTIT and Seizure of PETTIT's Phone**

53.  On August 31, 2019, the Honorable Alka Sagar, United States Magistrate Judge, issued an arrest warrant for PETTIT, based on a criminal complaint charging him with violating 21 U.S.C. § 841(a)(1) (distribution of a controlled substance).

---

[1] As detailed in the PETTIT Warrant (defined in paragraph 8), another individual delivered other drugs to McCormick on September 5, 2018, including cocaine and genuine oxycodone.

3

See 19-MJ-3630.[2]  The criminal complaint and supporting affidavit (together, the "PETTIT Warrant") are incorporated by reference and attached as Exhibit A.

54.  On September 4, 2019, DEA agents arrested PETTIT at PETTIT's residence and seized PETTIT's cellular telephone ("PETTIT's phone") pursuant to a search warrant.  PETTIT made his initial appearance that afternoon before the Honorable Maria A. Audero, United States Magistrate Judge, who ordered him detained pending trial.

### B.   PETTIT Supplied McCormick Counterfeit Oxycodone Pills Containing Fentanyl Two Days Before McCormick's Death

55.  As detailed in the PETTIT Warrant, on the night of September 4-5, 2018, PETTIT agreed to provide McCormick with drugs -- specifically (1) ten pills PETTIT referred to as "blues" and "30s"; (2) a "ball"; and (3) ten "bars."[3]  While the pills PETTIT referred to as "blues" and "30s" (hereinafter, the "Counterfeit Oxycodone Pills Containing Fentanyl") resembled genuine pharmaceutical oxycodone, in reality they contained fentanyl.

56.  Shortly after McCormick's death, law enforcement discovered a magazine in McCormick's bedroom covered with blue-colored powder and indentations (near a rolled piece of paper

---

[2] Judge Sagar also issued search warrants for PETTIT's person, residence, and car, as well as search warrants related to two other people.  See 19-MJ-3631 through 19-MJ-3637.

[3] As stated in the PETTIT Warrant, based on my training and experience, I know that "blues" and "30s" often refer to blue-colored pills containing 30 milligrams of oxycodone, a "ball" is a term for a quantity of cocaine, and "bars" refer to Xanax, a prescription anti-anxiety medication.

and a credit card-style gift card), indicating that McCormick crushed and snorted one or more of the Counterfeit Oxycodone Pills Containing Fentanyl before his death.  Only six of the ten Oxycodone Pills Containing Fentanyl that PETTIT agreed to provide McCormick were recovered from McCormick's residence.

**C.   PETTIT Obtained the Counterfeit Oxycodone Pills Containing Fentanyl from WALTER Through WALTER's Courier REAVIS**

57.   As described below, text messages from PETTIT's phone, searched pursuant to a warrant, show that on the night of September 4-5, 2018, PETTIT obtained the Counterfeit Oxycodone Pills Containing Fentanyl (referred to as "blues") from WALTER, through WALTER's courier REAVIS, before delivering them to McCormick.

### 1.   McCormick Asks PETTIT for Drugs

58.   Beginning at approximately 11:07 p.m. on September 4, 2018, the following text message exchange occurred between McCormick and PETTIT:

McCormick:   "Yoooo"

PETTIT:      "Yoo what's up"

McCormick:   "did you hear back bout addy?"

PETTIT:      "Nah I couldn't find any"

McCormick:   "All good. You don't have lean do u?"

McCormick:   "percs?"

PETTIT:      "I got some dilaudid 2s but that's about it"

PETTIT:      "I could get yellows and blues though"

McCormick:   "blues as far as percs?"

PETTIT:        "Yeah 30s"

McCormick:     "those are my shitttts man"

McCormick:     "When can u get em?"

PETTIT:        "Probably in an hour or 2"

PETTIT:        "They are 30 ea"

McCormick:     "any chance I could get 10 of those 10 bars and a ball?"

PETTIT:        "Yeah forsure"

PETTIT:        "I will get back when I'm about to pick them up"

### 2.   PETTIT Asks WALTER for Oxycodone

59.   Around 14 minutes later, at approximately 11:21 p.m., the following text message exchange began between PETTIT and WALTER using a telephone number 310-634-5551 ("WALTER's phone"):[4]

PETTIT:        "Yo what's up?"

WALTER:        "Yo"

PETTIT:        "Could I grab 10 blues"

WALTER:        "Yes"

. . .

WALTER:        "I'll send you a runner now"

PETTIT:        "Ok I'm out in Ktown at 346 n Vermont"

---

[4] WALTER's phone is believed to be used by WALTER, in part, because (1) Walter -- who is presently on supervised release following service of a 120-month federal drug trafficking sentence, see United States v. Walter, 05-CR-1055-R -- provided that telephone number to his probation officer; (2) law enforcement database records show that it is associated with WALTER; and (3) it is saved in PETTIT's phone under the name "Stevie NEW!!" and WALTER's first name is Stephen.

### 3. WALTER's "Runner" REAVIS Contacts PETTIT

16. Around 10 minutes later -- at approximately 11:33 p.m. -- the following text message exchange began between PETTIT and REAVIS using telephone number 619-530-2545 ("REAVIS's phone"):[5]

| | |
|---|---|
| REAVIS: | "Hey what's up this is Ryan Stevie's friend" |
| PETTIT: | "Hey what's up bro" |
| REAVIS: | "What's going on what can I do for you" |
| PETTIT: | "Could I get 10 blues to 346 n Vermont" |
| REAVIS: | "Yup" |
| REAVIS: | "20 minutes I'm on my way" |
| PETTIT: | "Ok sweet" |
| PETTIT: | "There's a gas station across the st" |
| PETTIT: | "That might be the best place to park" |
| REAVIS: | "I parked at Denny's[6] instead it was kind of busy over there with some transients and shit" |
| PETTIT: | "Forsure" |
| PETTIT: | "Coming" |

---

[5] REAVIS's phone is believed to be used by REAVIS, in part because: (1) law enforcement databases show that it is associated with REAVIS; (2) the user of REAVIS's phone identified himself as "Ryan" and REAVIS's first name is Ryan; (3) cell-site data for REAVIS's phone -- obtained pursuant to a search warrant, see In Re Cellular Telephones, 19-MJ-3927 -- showed REAVIS's phone communicating with a cellular tower located in the vicinity of the Lake Havasu, Arizona residence listed on REAVIS's driver license.

[6] A Denny's restaurant is located close to 346 North Vermont Avenue.

### 4.   PETTIT Delivers the Counterfeit Oxycodone Pills Containing Fentanyl to McCormick

17.   As detailed in the PETTIT Warrant, later that evening, at approximately 2:02 a.m., PETTIT sent the following text to McCormick: "Oh shit sorry I got sidetracked . . . Coming now." At approximately 2:25 a.m., PETTIT texted McCormick, "Here," indicating that he had arrived with the drugs.

**D.   PETTIT's Reaction to McCormick's Death**

18.   News reports of McCormick's death began circulating on the afternoon of September 7, 2018.  As detailed in the PETTIT Warrant, later that day, PETTIT discussed McCormick's death with people on Instagram, at one point stating, "I am not great . . . Most likely I will die in jail."

19.   Shortly before 2:00 p.m. on September 7, 2018, PETTIT began the following text message exchange with an individual using a phone number ending in 6364 (the "6364 User"):

PETTIT:      "Some really bad Shit just happened"

. . .

6364 User:  "It's alright. I hope you're ok. I have a feeling I know what it's about. I'm so sorry. I'm sure you're very upset."

PETTIT:      "Yeah, I'm just pretty sad and also a little worried."

. . .

6364 User:  "When was the last time you went there"

PETTIT:      "2 days ago"

PETTIT:      "Do you know Brandon Thompson?"

6364 User:  "Sounds familiar. What does he do"

8

| | |
|---|---|
| PETTIT: | "http://www.tmz.com/2018/08/15/demi-lovato-alleged-drug-dealer-arrested-guns-drugsoverdose"[7] |
| PETTIT: | "This is what I'm afraid of" |
| 6364 User: | "That guy is a moron tho. He posts photos of crap and he did an interview about Demi saying he did it" |
| 6364 User: | "Do a lot of his friends know you" |
| PETTIT: | "Yeah he's always been a dumbass" |
| PETTIT: | "No I don't fuck with those kids" |
| 6364 User: | "You're good then. I honestly wouldn't worry." |
| . . . | |
| 6364 User: | "Did he start doing heavier things" |
| PETTIT: | "Yeah just this last time. Never asked for anything like that before" |
| PETTIT: | "I figured it was for his friends or something" |
| 6364 User: | "What was it ? Heroin?" |
| PETTIT: | "No just blues" |
| PETTIT: | "I don't even have those I got them from my buddy" |
| 6364 User: | "I don't know what blues are" |
| PETTIT: | "A type of painkiller" |

---

[7] The news article associated with the hyperlink PETTIT sent the 6364 User is titled, "Demi Lovato Alleged Dealer Busted with Guns and Drugs . . . Months Before OD." It states, among other things, that, "The man who showed up at Demi Lovato's home and allegedly smoked drugs with her hours before her OD is no stranger to the law. . . . Brandon Johnson was arrested back in March with a stash of guns, drugs and cash . . . . We're also told Johnson is the man Demi texted to come over at 4 AM the morning she overdosed after freebasing Oxycodone potentially laced with fentanyl."

9

. . .

| | |
|---|---|
| PETTIT: | "I feel really guilty" |
| 6364 User: | "I'm sorry babe. But I'm sure if you didn't give it someone else would. Not your fault" |
| PETTIT: | "Usually when people ask me for opiates I tell them no and try to convince them to stay away from that type of stuff" |
| PETTIT: | "But yeah you're probably right I can't control him" |
| 6364 User: | "Yeah. It was his choice" |
| PETTIT: | "Yeah thank you baby" |

. . .

| | |
|---|---|
| PETTIT: | "Baby I really miss you" |
| 6364 User: | "Miss you too" |
| PETTIT: | "If I have to go to jail I hope to spend some time with you first" |

### E.   PETTIT Continues to Buy "Blues" from WALTER After McCormick Death

20.   Despite his apparent belief that the "blues" (i.e., the Counterfeit Oxycodone Containing Fentanyl) that he obtained from WALTER caused McCormick's death, PETTIT continued to purchase "blues" from WALTER.  On October 2, 2018 -- less than one month after McCormick's death -- the following text message exchange occurred between PETTIT and WALTER:

| | |
|---|---|
| PETTIT: | "Can I get 10 blues?" |
| WALTER: | "Yes" |
| PETTIT: | "Awesome! Should I come to you?" |
| WALTER: | "Yeah" |

### F.   PETTIT Continues to Buy Drugs from WALTER

21.   Text messages between PETTIT and WALTER show that PETTIT continued to buy drugs from WALTER through August 2019 and that WALTER continued to use one or more couriers, including REAVIS, to send the drugs.  These text messages also show that on several occasions -- including as recently as August 2019 -- WALTER Directed PETTIT to pick up drugs at 1417 Veteran Avenue, which is across the street from WALTER'S RESIDENCE.

22.   On October 26, 2018, for example, the following text message exchange occurred between PETTIT and WALTER:

| | |
|---|---|
| PETTIT: | "Yoo" |
| WALTER: | "Yo" |
| PETTIT: | "Are you on deck with mushrooms and acid" |
| WALTER: | "I got shrooms" |
| PETTIT: | "Dope should I swing by?  I just need a half" |
| WALTER: | "Half oz" |
| PETTIT: | "Yeah" |
| WALTER: | "$150" |
| WALTER: | "$120" |
| PETTIT: | "Ok cool" |
| PETTIT: | "I'll be there in 25" |

23.   On January 3, 2019, the following text message exchange occurred between PETTIT and WALTER:

| | |
|---|---|
| PETTIT: | "I'm off work at 1 can I come grab a zip of mol" |
| WALTER: | "Mite b a lil short of a zip but it's almost all there" |

11

WALTER:        "I'll clock it up"

PETTIT:        "Ok thanks"

WALTER:        "I got a whole one"

PETTIT:        "Ok sweet"

PETTIT:        "I'll hit you up when I'm leaving here"

WALTER:        "Ok"

PETTIT:        "Yo I just got off actually are you around?"

WALTER:        "Ryan will bring it down"

PETTIT:        "Ok cool"

PETTIT:        "12?"

WALTER:        "Yes"

WALTER:        [Sends attachment "Rian 3.vcf"]

24.   Based on WALTER's reference to "Ryan" (i.e., REAVIS's first name) and the inclusion of the file "Rian 3.vcf" -- which contained the telephone number for REAVIS's phone -- I believe that REAVIS delivered drugs to PETTIT on behalf of WALTER on this occasion.

25.   On January 24, 2019, the following text message exchange occurred between PETTIT and WALTER:

PETTIT:        "Yo are you around?"

WALTER:        "Vegas"

PETTIT:        "Oh fasho have fun"

WALTER:        "My runner will text you"

PETTIT:        "Ok"

PETTIT:        "Just looking for a zip of the same"

PETTIT:        "Thx bro"

WALTER:       "Ty too"

26.   Between March 12, 2019 and March 17, 2019, the following text message exchange occurred between PETTIT and WALTER:

PETTIT:       "Looking for 2 zips of the same"

WALTER:       "Moonrock?"

PETTIT:       "Yeah"

WALTER:       "I think I have one on me"

WALTER:       "I'll make the call for more"

. . .

WALTER:       "$200 an oz"

WALTER:       "$180"

. . .

WALTER:       "The M.R. Landed finally"

PETTIT:       "Awesome! I can come through around 9:30 if that works"

WALTER:       "Yes"

PETTIT:       "Ok cool see you then"

PETTIT:       "Yo actually I'm gonna come tomorrow if you're around I got too much going on tonight"

WALTER:       "My runner will bring it to I"

WALTER:       "U"

27.   On April 3, 2018, the following text message exchange occurred between PETTIT and WALTER:

PETTIT:       "Yo whattup"

WALTER:       "Yo"

PETTIT:      "Do you have blow?"[8]

WALTER:      "Yes"

PETTIT:      "Dope how much is a zip"

WALTER:      "Kinda expensive"

WALTER:      "$1000"

WALTER:      "Maybe $950"

PETTIT:      "Fasho I can do that"

. . .

WALTER:      "Want me to send a runner to ur pad"

PETTIT:      "Yeah that would be great"

PETTIT:      "I'm at 1865 n Fuller Ave"[9]

28.   Between April 10, 2019 and April 12, 2019, the following text message exchange occurred between PETTIT and WALTER:

PETTIT:      "Yo what's up"

WALTER:      "I got 3 sub zips of m.r"

PETTIT:      "I still got some m but how much do you do shrooms for again?"

PETTIT:      "Yo do you have shrooms? Looking to get a zip or 2"

WALTER:      "Yes"

PETTIT:      "How much for 2 zips?"

WALTER:      "$180 ea"

---

[8] Based on my training and experience, I know that "blow" commonly refers to cocaine.

[9] PETTIT was arrested at 1865 North Fuller Avenue on September 4, 2019.

14

PETTIT:       "Ok cool can I get 2"

PETTIT:       "Lmk"

WALTER:       "Yes"

PETTIT:       "Ok sweet should I come there or can someone swing by"

WALTER:       "1417 veteran ave"

PETTIT:       "Kk"

PETTIT:       "Omw" [i.e., on my way]

WALTER:       "Ok"

PETTIT"       "Here"

WALTER:       "Coming"

29.   On May 15, 2019, the following text message exchange occurred between PETTIT and WALTER:

PETTIT:       "Could I get one z of m"

WALTER:       "Yes"

WALTER:       "I got 4"

PETTIT:       "Ok cool I just need 1"

WALTER:       "Ok"

PETTIT:       "Ok I'll come by after traffic!"

WALTER:       "Kool"

PETTIT:       "On my way to you if that's cool"

WALTER:       "Yes"

PETTIT:       "Kk which address"

WALTER:       "1417 veteran Ave"

PETTIT:       "Ok sweet"

PETTIT:       "Here"

WALTER:      "Coming"

30.   Between August 3, 2019 and August 8, 2019, the following text message exchange occurred between PETTIT and WALTER:

PETTIT:      "Can I grab 1.5 zips of mol"

WALTER:      "I only have like 20 gs"

WALTER:      "I'll get some more and call u"

PETTIT:      "Awesome thanks brother"

WALTER:      "Np"

PETTIT:      "Btw how is your white rn?"[10]

WALTER:      "Excellent"

PETTIT:      "Could I grab a oz of that and a half of mol right now then get the other mol later when you get it?"

WALTER:      "Yes"

WALTER:      "1417 Veteran Ave"

PETTIT:      "Ok sweet be there in 25"

PETTIT:      "Here"

WALTER:      "Coming"

. . .

PETTIT:      "Yo let me know when I can grab that other one"

WALTER:      "I'm waiting for it too"

PETTIT:      "Fasho"

WALTER:      "Got it"

PETTIT:      "Sweet can I come grab it tomorrow afternoon?"

---

[10] I know that "white" commonly refers to cocaine.

WALTER:     "Ok"

PETTIT:     "Sweet thanks"

PETTIT:     "Yo are you around"

WALTER:     "Yes"

PETTIT:     "Dope I can be there in about 45"

WALTER:     "Ok"

WALTER:     "U want an oz of mol"

PETTIT:     "Yeah just one"

WALTER:     "Kool"

PETTIT:     "Ok sweet"

WALTER:     "I'm at FRIDA"

WALTER:     "MEXICAN RESTAURANT by my pad"

PETTIT:     "Kk"

PETTIT:     "On Beverly"

WALTER:     "No"

WALTER:     "Close to my pad"

PETTIT:     "Lindbook?"

WALTER:     "Lindbrooke"

WALTER:     "Yes"

PETTIT:     "Kk"

PETTIT:     "2 min"

WALTER:     "Ok"

WALTER:     "Black Benz"

WALTER:     "Across the street"

WALTER:     "Park behind it"

PETTIT:     "Kk"

PETTIT:     "Here"

WALTER:     "Erica is coming out"

WALTER:     "Where r u"

WALTER:     "She's at the Blk Benz"

PETTIT:     "Just met with her"

WALTER:     "Kool"

PETTIT:     "Thanks Bro"

31.   Frida Mexican Cuisine is located at 10853 Lindbrook Drive in Los Angeles, less than one mile from WALTER'S RESIDENCE.

32.   On August 30, 2019, the following text message exchange occurred between PETTIT and WALTER:

WALTER:     "What's the order"

PETTIT:     "1 oz white .5 oz m"

WALTER:     "White is $1000 . . . . . u want 5 oz of mr"

PETTIT:     "No just 1/5 oz"

PETTIT:     "1/2***"

WALTER:     "Ok"

PETTIT:     "Half oz"

WALTER:     "Got it"

PETTIT:     "Sweet should I come to veteran"

WALTER:     "Sure"

PETTIT:     "Awesome I'll be there in about an hour"

WALTER:     "Ok"

PETTIT:     "Almost there"

PETTIT:      "Could I also get 1 oz mushrooms"

WALTER:      "No shrooms"

PETTIT:      "Ok no worries"

PETTIT:      "Here"

WALTER:      "Coming"

### G.   Further Investigation of WALTER'S RESIDENCE and WALTER'S CAR

#### 1.   WALTER'S RESIDENCE

33.   WALTER'S RESIDENCE is located at 1440 Veteran Avenue, Apartment 320, Los Angeles, California, 90024, in an apartment complex named the Colony at Westwood.  My belief that WALTER presently resides at WALTER'S RESIDENCE is based, in part, on the following:

34.   On September 18, 2019, the Honorable Patrick J. Walsh, United States Magistrate Judge, issued a warrant authorizing the government to obtain cell-site location data for WALTER's phone and REAVIS's phone.  See In Re Cellular Telephones, 19-MJ-3927.

35.   The cell-site location data obtained pursuant to this warrant established that, on September 19, 2019, WALTER's phone was communicating with one or more cellular towers in the vicinity of 1417 Veteran Avenue in Los Angeles -- i.e., the address WALTER told PETTIT to meet him to pick up drugs.

36.   On the evening of September 19, 2019, agents conducted physical surveillance in the vicinity of 1417 Veteran Avenue. During this surveillance, agents saw WALTER'S CAR (i.e., the 2013 dark brown Mercedes Benz S550) in parking spot number 124 at the Colony at Westwood apartment complex located at 1440

Veteran Avenue.   1440 Veteran Avenue is almost directly across the street from 1417 Veteran Avenue.

37.   Agents then reviewed a parking lot manifest for the Colony at Westwood, which indicated that parking spot number 124 is associated Apartment 320 (i.e., WALTER'S RESIDENCE). However, WALTER was not listed as a resident of Apartment 320 on that manifest; two other individuals were listed instead.

38.   Shortly after 8:00 p.m., while dressed in civilian clothing, I knocked on the front door of Apartment 320 (i.e., WALTER'S RESIDENCE).   A tall Caucasian male with a shaved head opened the door, whom I positively identified as WALTER based on my review of WALTER's driver license photograph and pedigree information.   I told WALTER that I was looking for "Desiree," and WALTER told me I had the wrong apartment.   I later reviewed cellular telephone video footage of the encounter -- taken by another agent -- and confirmed that the man who opened the door was WALTER.

39.   WALTER is presently on supervised release in this District,[11] and the Probation Department informed me that WALTER

---

[11] In 2005, WALTER was indicted on the following four charges: (1) possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); unlawful possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1); (3) possession of counterfeit U.S. currency, in violation of 18 U.S.C. § 472; and (4) possession of a firearm during and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).   See United States v. Walter, 05-CR-1055-R (C.D. Cal. 2005).   He pled guilty to the first three counts, and was sentenced to 120 months' imprisonment.   On August 28, 2019, WALTER admitted to violating the terms of his supervised release, was sentenced to

reported living at a residence in Hawthorne, California.  In my training and experience, individuals engaged in criminal activities often attempt hide the location of those activities from law enforcement.[12]

### 2.   WALTER'S CAR

40.   WALTER'S CAR is a dark brown 2013 Mercedes Benz S550 with California license plate 7XVK141 and vehicle identification number WDDNG7DBXDA529029 registered to WALTER at 4875 West 133rd Street, Hawthorne, California, 90250.  I believe that WALTER'S CAR is used by WALTER, in part, because (1) California Department of Motor Vehicle records show that it is registered in WALTER's name; and (2) WALTER'S CAR was parked in the parking spot associated with WALTER'S RESIDENCE on September 19, 2019.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

41.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

---

five months' imprisonment, and ordered to self-surrender on September 26, 2019.

[12] Similarly, database searches have revealed no association between WALTER and WALTER'S RESIDENCE.  In my training and experience, individuals engaged in criminal activities, often avoid associating their names with the location of those activities.

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[13]

42.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[13] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

44.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the WALTER's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the WALTER's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

45.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  <u>CONCLUSION</u>

46.  For all of the reasons described above, there is probable cause to believe that WALTER has violated 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the person, residence, and vehicle, described in Attachments A-1, A-2, and A-3.


Tommy S. Fung
Special Agent
Drug Enforcement Administration


Subscribed to and sworn before me
this 20th day of September, 2019


THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT A

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

AUG 3 0 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | |
|---|---|
| United States of America | |
| v. | Case No.  19MJ 0363 C |
| CAMERON JAMES PETTIT, | |
| Defendant. | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 5, 2018, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*(s|*
*Complainant's signature*

Tommy S. Fung, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   8/30/19

_____
**ALKA SAGAR**
*Judge's signature*

City and state:   Los Angeles, California

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Matthew J. Jacobs, (213) 894-2213

## **AFFIDAVIT**

I, Tommy S. Fung, being duly sworn, declare and state as follows:

### I. **PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of a criminal complaint and arrest warrant against CAMERON JAMES PETTIT ("PETTIT"), for violations of 21 U.S.C. § 841(a)(1) (distribution of a controlled substance).

2.     This affidavit is also made in support of an application for a warrant to search:

a.   the person of PETTIT, as described more fully in Attachment A-1;

b.   1865 North Fuller Avenue, Apartment 206, Los Angeles, California 90046 ("PETTIT'S RESIDENCE"), as described more fully in Attachment A-2;

c.   a 2012 Mercedes Benz CLS 550 with California license plate M002W0 and vehicle identification number ("VIN") WDDLJ7DB8CA040491 registered to PETTIT at 386 Cliff Drive, Laguna Beach, California 92651 ("PETTIT'S CAR"), as described more fully in Attachment A-3;

d.   the person of MIA PASCAL JOHANSSON ("JOHANSSON"), as described more fully in Attachment A-4;

e.   6300 Variel Avenue, Apartment 135, Woodland Hills, California 91367 ("JOHANSSON'S RESIDENCE") as described more fully in Attachment A-5;

f.   a 2013 white Mercedes Benz E350 with California license plate 8EQZ173 and VIN WDDHF5KB6DA765958 registered to

1

JOHANSSON at 15370 Weddington Street, Apartment 103, Sherman Oaks, California 91411 ("JOHANSSON'S CAR") as described more fully in Attachment A-6; and

      g.   the person of KARLA AMADOR, also known as "Carla" and "Carolina Cortez" ("AMADOR"), as described more fully in Attachment A-7.

3.  From the premises, vehicle, and person described in Attachments A-1 through A-3, the requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) and 21 U.S.C. § 846 (conspiracy to distribute controlled substances) (together, the "Subject Narcotics Offenses"), as described more fully in Attachment B-1.

4.  From the premises, vehicle, and persons described in Attachments A-4 through A-7, the requested search warrants also seek authorization to seize evidence, fruits, or instrumentalities of violations of the Subject Narcotics Offenses, as well as 18 U.S.C. § 1952 (use of facilities in interstate commerce with intent to further unlawful activity, namely, prostitution in violation of California law) (together with the "Subject Narcotics Offenses," the "Subject Offenses"), as described more fully in Attachment B-2. Attachments A-1 through A-7, B-1, and B-2 are incorporated herein by reference.

5.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements, including text messages, described in this affidavit are related in draft form and in substance and in part only.

## II. BACKGROUND OF AFFIANT

6.    I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been since May 2012.   I am currently assigned to the High Intensity Drug Trafficking Area ("HIDTA") division in the Los Angeles HIDTA Office.   Additionally, I am a member of the HIDTA Fusion Task Force, which is tasked with, among other responsibilities, investigating suspected opioid-related overdose deaths in Los Angeles County.

7.    As an SA, I have received 16 weeks of specialized training in Quantico, Virginia pertaining to drug trafficking, money laundering, undercover operations, and electronic and physical surveillance.   Throughout my career as a federal agent, I have interviewed narcotics users, buyers, sellers, manufacturers, transporters, and informants, and I have discussed with them, and with other law enforcement officers, the methods drug traffickers use to safeguard their drugs and illicit proceeds and to avoid law enforcement detection. Additionally, I have conferred with other law enforcement officers regarding prostitution-related crimes, and how

3

telephones, computers, and the Internet are used to facilitate
and conceal such crimes.

### III.  SUMMARY OF PROBABLE CAUSE

8.   As discussed below, evidence shows that on September
7, 2018, 26-year-old Malcolm James McCormick died of a drug
overdose -- specifically, a mixed drug toxicity involving
fentanyl, cocaine, and ethanol.  In McCormick's home, law
enforcement found evidence that McCormick snorted counterfeit
oxycodone pills containing fentanyl shortly before his death.
Two days before McCormick's death, in the early morning hours of
September 5, 2019, PETTIT delivered counterfeit oxycodone pills
that contained fentanyl -- a dangerous synthetic opioid --
cocaine and Xanax to McCormick.  Hours after reports of
McCormick's death became public, PETTIT told a friend that he
would die in jail and asked another friend if he should post
messages he had with McCormick.  PETTIT resides at PETTIT'S
RESIDENCE and drives PETTIT'S CAR.

9.   As discussed below, evidence also shows that in the
early morning hours of September 5, 2019, a prostitute, AMADOR,
delivered genuine oxycodone, hydrocodone, amphetamine, Xanax,
and cocaine to McCormick.  AMADOR had been sent to McCormick
with drugs by her madam, JOHANSSON, after McCormick contacted
JOHANSSON for drugs because PETTIT did not immediately respond
to McCormick's text messages.  JOHANSSON is PETTIT's associate
and had worked in the past with PETTIT to sell drugs to
McCormick.  JOHANSSON resides at JOHANSSON'S RESIDENCE and
drives JOHANSSON'S CAR.

4

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   McCormick Died of a Drug Overdose on September 7, 2018**

10.   On the morning of September 7, 2018, McCormick was found dead in his residence in Studio City, California.   I have reviewed the autopsy and toxicology report from the Los Angeles County Medical Examiner-Coroner, and learned that McCormick died of mixed drug toxicity involving fentanyl, cocaine, and ethanol.

**B.   PETTIT and JOHANSSON Were Jointly Involved in Distributing Controlled Substances to McCormick**

11.   Following McCormick's death, law enforcement recovered McCormick's cellular telephone from his residence.[1]   I have reviewed contents of McCormick's phone.

12.   McCormick's phone contained numerous text messages between McCormick and PETTIT, and between McCormick and JOHANSSON, in the months before McCormick's death.[2]   As described below, these text messages establish that JOHANSSON introduced PETTIT to McCormick and that JOHANSSON and PETTIT were jointly involved in distributing controlled substances to McCormick

---

[1] I believe that McCormick's phone belongs to McCormick based, in part, on the fact that it was recovered from McCormick's residence and because it contains numerous photographs of McCormick and messages addressed to McCormick.

[2] I believe that the text messages described in this affidavit were sent to and from telephone numbers belonging to PETTIT and JOHANSSON, in part, because subscriber information from Sprint and AT&T show that such text messages were sent to and from telephone numbers subscribed to by, respectively, "Cameron Pettit" and "Mia P. Johansson."   In addition, those telephone numbers were saved in McCormick's phone under the names "Cam" and "Mia" (<u>i.e.</u>, the first names of PETTIT and JOHANSSON), and the names "Cam," "Cameron," and "Mia" appear in the content of various text messages between McCormick and PETTIT and JOHANSSON.

    a.   On June 15, 2018, for example, JOHANSSON sent a group text message to both McCormick and PETTIT stating: "Cam [i.e., PETTIT]- I included my boy Mac[3] in this message- take care of him."  Following this text message, McCormick requested controlled substances from PETTIT -- and PETTIT agreed to provide McCormick with controlled substances -- on various occasions between July and September 2019.[4]  *2018* (T.F.)

    b.   At times, when PETTIT was not able to promptly deliver controlled substances, McCormick contacted JOHANSSON. On August 25, 2018, for example, McCormick texted PETTIT to ask if he could "cop" (which, based on my training and experience, I know to be a term that refers to purchasing controlled substances).  After PETTIT responded that he was at work, McCormick initiated the following text message exchange with JOHANSSON:

    McCormick:   ". . . are you close to the cribbo"

    JOHANSSON:   "Huh? . . . I'm at my house why wats up hun"

    McCormick:   "cam [i.e., PETTIT] just at work another 30"

    JOHANSSON:   "I'm out love"

---

    [3] I know that McCormick was commonly known by the name "Mac Miller."

    [4] On July 17, 2018, for example, McCormick texted PETTIT, "can I get some bars?" and PETTIT replied, "yea for sure, how many?"  On July 28, McCormick texted PETTIT, "can I grab a ball 10 blue guys and some bars," and PETTIT responded, "Yeah forsure."  On August 17, 2018, McCormick asked, "you got a g and some blue guys?" and PETTIT responded "I got you."  Based on my training and experience, and discussions with other agents, I have come to learn that Xanax is often referred to as "bars," quantities of cocaine are often referred to as a "G" or a "ball," and blue-colored oxycodone pills are often referred to as "blues."

. . .

JOHANSSON:   "Do you want me to see if my other boy can come
              now or you waiting for Cameron"

McCormick:   "See what the deal with him is . . . just need
              a quick g"

JOHANSSON:   "Ok."

McCormick:   "Muchos gracias . . . Anything?"

JOHANSSON:   "No hun sorry"

McCormick:   "All good I can wait on cam"

Based on the content and context of these messages -- including
JOHANSSON's statement that "I got none" and her subsequent offer
to "see if my other boy can come now" -- I believe that
McCormick contacted JOHANSSON to purchase controlled substances
on this occasion.

       c.   At times, McCormick also paid JOHANSSON for drugs
PETTIT supplied.  For example, in the early morning hours of
September 3, 2018, PETTIT texted McCormick to settle McCormick's
tab: "We still didn't take care of that 260 so now we're at
340."  In response, McCormick stated, "I got u bruh . . .
Handling now . . . Just threw Mia [i.e., JOHANSSON] cash," to
which PETTIT replied, "Thanks brotha."  Notably, records from
Venmo -- a money transfer service -- reflect that a Venmo user
"@Malcolm-McCormick-1" sent $340 to Venmo user "@Mia-Johansson"
on the morning of September 3, 2018.  A note accompanying the
payment states, "For cam."

13.    Publicly accessible photographs from Instagram account "miamouse8," which I believe belongs to JOHANSSON,[5] show that JOHANSSON and PETTIT have known each other since at least 2017, and that their association continued after McCormick's death.  For example, a photograph posted on April 4, 2017 depicts PETTIT with his arm around JOHANSSON, accompanied by the caption "miamouse8 . . . @chefcambam . . . good time with good friends."  I am familiar with PETTIT's appearance based on my review of PETTIT's photograph with the California Department of Motor Vehicles.  In addition, a photograph posted July 21, 2019 -- approximately six weeks ago -- depicts PETTIT and JOHANSSON together, accompanied by the caption "miamouse8 Good time like old times with the fam @lil.cambam."[6]

**C.    Communications Between McCormick and PETTIT, and between McCormick and JOHANSSON, on September 4-5, ~~2019~~ 2018 (T.F.)**

14.    As described below, text messages between McCormick and PETTIT, and between McCormick and JOHANSSON, beginning the night of September 4, 2018 show that PETTIT supplied McCormick with drugs during the early morning hours of September 5, 2018, and that JOHANSSON arranged for a prostitute -- AMADOR, using

---

[5] I believe the Instagram account "miamouse8" belongs to JOHANSSON, in part, because JOHANSSON appears in many of the photographs associated with the account.  I am familiar with JOHANSSON's appearance based on my review of her photograph with the California Department of Motor Vehicles.  In addition, JOHANSSON's first name ("Mia") is included in the Instagram account name.

[6] Instagram accounts containing a shortened version of PETTIT's first name (i.e., "Cam") are also linked in the captions.

the alias "Carla"[7] -- to provide drugs to McCormick around the same time.

      1.   <u>McCormick Asks PETTIT for Controlled Substances</u>

     15.  Between approximately 11:07 p.m. and 11:58 p.m. on September 4, 2018, the following text message exchange occurred between McCormick and PETTIT:

| | |
|---|---|
| McCormick: | "Yoooo" |
| PETTIT: | "Yoo what's up" |
| McCormick: | "did you hear back bout addy?" |
| PETTIT: | "Nah I couldn't find any" |
| McCormick: | "All good. You don't have lean do u?" |
| McCormick: | "percs?" |
| PETTIT: | "I got some dilaudid 2s but that's about it" |
| PETTIT: | "I could get yellows and blues though" |
| McCormick: | "blues as far as percs?" |
| PETTIT: | "Yeah 30s" |
| McCormick: | "those are my shitttts man" |
| McCormick: | "When can u get em?" |
| PETTIT: | "Probably in an hour or 2" |
| PETTIT: | "They are 30 ea" |
| McCormick: | "any chance I could get 10 of those 10 bars and a ball?" |
| PETTIT: | "Yeah forsure" |
| PETTIT: | "I will get back when I'm about to pick them up" |

_____

   [7] Probable cause to believe that "Carla" is an alias for AMADOR is set forth in Part IV.G, <u>infra</u>.

McCormick:      "fasho.  Could you actually drop at the studio?"

PETTIT:         "Yeah where at?"

McCormick:      "I'm at Conway"

McCormick:      "Lemme send u the address.

McCormick:      "655 north St. Andrews place"[8]

PETTIT:         "Kk"

McCormick:      "is that far from you?"

PETTIT:         "Not too far I can make it"

McCormick:      "Okay word. Lmk when u on the way"

PETTIT:         "ok I will"

McCormick:      "What time u thinkin?"

PETTIT:         "Probably 1"

McCormick:      "that's for the blues too? Could u come thru with the other earlier?"

PETTIT:         "Yeah that's for all of it. I'm going to pick them up right now"

McCormick:      "Actually I can wait lol"

McCormick:      "Beautiful"

PETTIT:         "Ok sweet"

The text messages above establish that PETTIT agreed to provide McCormick with the following controlled substances: (1) ten pills that PETTIT referred to as "blues" and "30s"; (2) a "ball"; and (3) ten "bars." Based on my training and experience, and discussions with other agents, I know that

---

[8] Conway Recording Studios is a music studio located near the intersection of North Saint Andrews Place and Melrose Avenue in Los Angeles.

"blues" and "30s" often refer to blue-colored pills containing 30 milligrams of oxycodone, a "ball" is a term for a quantity of cocaine, and "bars" refer to Xanax, a prescription anti-anxiety medication.  Accordingly, I believe that, on the night of September 4, 2019, PETTIT agreed to supply McCormick with (1) ten 30 milligram oxycodone pills; (2) ten Xanax pills; and (3) cocaine.

### 2.   PETTIT Does Not Promptly Respond to McCormick's Follow-Up Text Messages

16.  Approximately one hour later -- at 12:56 a.m. on the morning September 5, 2018 -- McCormick texted PETTIT, "yo, yo." Approximately eight minutes later, McCormick texted PETTIT, "Wya?" (which I understand to be an abbreviation for "Where you at?").  Soon after, McCormick sent PETTIT a third text message, containing only a question mark.  PETTIT did not respond to these messages for approximately one hour.

### 3.   McCormick Asks JOHANSSON for Controlled Substances

17.  At approximately 1:12 a.m. on September 5, 2018 -- shortly after PETTIT failed to respond to McCormick's texts "yo, yo . . . Wya?" -- McCormick contacted JOHANSSON.  The following text message exchange occurred between McCormick and JOHANSSON between approximately 1:12 a.m. to 1:47 a.m.:

McCormick:   "Cam is supposed to be pullin up and he ain't answering"

JOHANSSON:   "I don't know hun"

McCormick:   "Is there anybody else wit the shits?"

JOHANSSON:   "I can send some with a girl lol"

McCormick:   "I need a few things"

JOHANSSON:   "I have everything lol"

McCormick:   "Snow bars and blue percs?"

JOHANSSON:   "I have it all"

McCormick:   "Do you have the lean too?"

JOHANSSON:   "No lean lol but Adderall too"

JOHANSSON:   "I have oxy"

McCormick:   "percs?"

JOHANSSON:   "I have norco"

McCormick:   "What mg? On oxy and norco?"

JOHANSSON:   "30 mg oxy and 10 mg norco"

McCormick:   "So the oxy are little?"

JOHANSSON:   "Yes little blue pill"

McCormick:   "Can I get 5 of those 5 bars and a g of snow?"

JOHANSSON:   "Yes"

JOHANSSON:   "30 mg oxy is $30 each and $5 each bar, $10
             each norco (they are 10 mg) ill give you the g
             for free if you book a girl"

McCormick:   "what about 2 gs?"

JOHANSSON:   "Deal lol"

McCormick:   "What girls is available?"

JOHANSSON:   "Carla [i.e., AMADOR] is ready"

McCormick:   "So what would my total be?"

McCormick:   "Send me a picture of the oxy tho"

JOHANSSON:   [Photograph of round blue pill imprinted with
             "E|8"]

McCormick:   "How long would all this take to arrive?"

| | |
|---|---|
| JOHANSSON: | "30 min" |
| McCormick: | "I'm at 655 St. Andrews" |
| JOHANSSON: | "With girl lol ?" |
| McCormick: | "Arrrghh" |
| JOHANSSON: | "Lol" |
| McCormick: | "What's the total of everything else" |
| JOHANSSON: | "5 oxy $150 ($30 each) 5 bars $25 ($5 each) 5 norco $50 ($10 each) 10 Addy $100 ($10 each) 2 g's (FREE) Girl $700. Total: $1025" |
| McCormick: | "send thruuuu" |
| JOHANSSON: | "S or N St. Andrews" |
| McCormick: | "North" |
| JOHANSSON: | "She's 31 min away" |

The text messages above establish that JOHANSSON agreed to provide McCormick with the following narcotics: (1) five "oxy"; (2) five "bars"; (3) ten "Addy"; (4) five "norco"; and (5) "2 g's" of "snow." Based on my training and experience, I understand that "oxy" is an abbreviation for oxycodone, that "Addy" is an abbreviation for Adderall, a brand name prescription drug containing amphetamine, that Norco is a brand name prescription drug containing hydrocodone, and that "snow" is a commonly used name for cocaine. In addition, as noted above, "bars" refers to Xanax. Accordingly, I believe that JOHANSSON agreed to provide McCormick with: (1) five oxycodone pills; (2) five Xanax pills; (3) ten Adderall pills; (4) five Norco pills; and (5) two grams of cocaine.

13

4.   PETTIT Delivers Drugs to McCormick

18.  At 2:02 a.m. -- approximately one hour after McCormick last tried contacting PETTIT, and approximately 15 minutes after the above-described text message exchange between McCormick and JOHANSSON ended -- PETTIT sent the following text to McCormick: "Oh shit sorry I got sidetracked . . . Coming now." McCormick replied, "Fasho" (which I understand to be a form of the phrase "for sure").

19.  At approximately 2:25 a.m., PETTIT texted McCormick, "Here," indicating that he had arrived at the studio referenced in McCormick's earlier text messages. McCormick responded by asking if PETTIT was "thru the gate," and PETTIT replied that he was "in front of the gate on St. Andrews." Accordingly, I believe that PETTIT ultimately delivered drugs to McCormick at the studio shortly after 2:25 a.m. on September 5, 2018.[9]

5.   AMADOR Delivers Drugs to McCormick, as Arranged by JOHANSSON

20.  Based on my review of McCormick's text messages, I also believe that the woman JOHANSSON referred to as "Carla" -- i.e., AMADOR -- visited McCormick at the studio during the early morning hours of September 5, 2018. Beginning at around 2:30 a.m., for example, McCormick and JOHANSSON exchanged the

---

[9] Cell-site location data from Sprint indicate that PETTIT's telephone communicated with a cellular tower less than one mile from Conway Recording Studio between approximately 1:11 a.m. and 1:20 a.m. on September 5, 2018. The records from Sprint contain no cell-site location data after 1:20 a.m. on the morning of September 5, 2018. Based on discussions with other agents and cellular service provider information, I know that not all transmissions over cellular telephones result in the creation of cell-site location data.

following text messages regarding how and when McCormick would pay for AMADOR's services and the drugs JOHANSSON agreed to supply:

| | |
|---|---|
| JOHANSSON: | "How are you gonna send it hun cash app or Venmo?" |
| JOHANSSON: | "Are you gonna send it tonight or tomorrow hun?" |
| McCormick: | "I'll handle tomorrow" |
| JOHANSSON: | "Ok hun" |
| JOHANSSON: | "Did you want to extend an hr?" |
| McCormick: | "Yes pleaaase" |
| JOHANSSON: | "Ok cool :)" |
| JOHANSSON: | "Well just handle the $ tomorrow :)" |

Based on the content and context of these messages, I believe that JOHANSSON's question, "Did you want to extend an hr?" referred to whether McCormick wanted to purchase an extra hour of prostitution services with AMADOR.

21. Later on September 5, 2018, JOHANSSON sent McCormick a text message explaining the cost of AMADOR's prostitution services and the drugs:

> JOHANSSON: "$325 pills.  Normally it would have been $3500 for Carla [i.e., AMADOR] but I'll take it from $700 an hr to $600 so only 3k and also I got you on the white :)) Total $3325.  Hope you had a great night?  Lmk how you want to square up hun xx"

22. On the evening of September 5, 2018, JOHANSSON sent another series of text messages reiterating that McCormick owed $3,000 for "Carla's" services -- "5 hrs at $600 each hr . . .

15

Instead of $700 . . . Since you did so many hrs" -- plus $325 for the drugs. McCormick acknowledged that a female had been present with him for several hours -- "I just wanted an extra hour but I guess I never told her to leave . . . All the sudden in was 7am. I was just working and she was kickin it" -- and ultimately agreed to pay JOHANSSON. JOHANSSON's request for payment, and McCormick's willingness to pay, provides further reason to believe that "Carla" (i.e., AMADOR) visited him on September 5, 2018.

23. Moreover, JOHANSSON's text messages itemizing the cost of each controlled substance, and their total cost of "$325," further establishes that "Carla" (i.e., AMADOR) delivered to McCormick the type and quantity of drugs that JOHANSSON agreed to provide him (in addition to the free cocaine), specifically: (1) five oxycodone pills, at a price of $30 per pill, for a total price $150; (2) five Xanax pills, at a price of $5 per pill, for a total price $25; (3) ten Adderall pills, at a price of $10 per pill, for a total price of $100; and (4) five Norco pills, at a price of $10 per pill, for a total price $50.

**D.  Drugs Found at McCormick's Home Following McCormick's Death**

24. On September 7, 2018, after McCormick's death, law enforcement recovered a plastic bag from a coat hanging in McCormick's bathroom closet, which contained the following pills:

    a.   six round blue pills imprinted with a "V" on one side and "48|12" on the other (the "Counterfeit Oxycodone Pills Containing Fentanyl")

    b.   five round blue pills imprinted with "E|8" (the "Oxycodone");

    c.   ten round orange pills imprinted with "U30" (the "Amphetamine");

    d.   five white oval pills imprinted with "G037" (the "Hydrocodone"); and

    e.   14 white rectangular pills (some of which were broken) imprinted with "XANAX" (the "Xanax").

25.  As described in the subparagraphs below, I believe that this bag contained all of the pills supplied by both PETTIT and JOHANSSON (through AMADOR) on September 5, 2018, less the pills that McCormick ingested before his death.  Based on the chemical analyses of the pills conducted by a forensic laboratory and the text messages described above, I believe that PETTIT supplied McCormick with the Counterfeit Oxycodone Pills Containing Fentanyl and some of the Xanax, while JOHANSSON (through AMADOR) supplied McCormick with the Oxycodone, Amphetamine, Hydrocodone and the remainder of the Xanax.

    a.   **Counterfeit Oxycodone Pills Containing Fentanyl:** The six round blue pills imprinted with a "V" on one side and "48|12" on the other tested positive for fentanyl, a synthetic opioid significantly more powerful that heroin.  I believe that PETTIT provided the Counterfeit Oxycodone Pills Containing Fentanyl to McCormick, in part, because McCormick asked PETTIT

to supply "percs," an abbreviation for Percocet, which is a prescription painkiller containing oxycodone; PETTIT described the Counterfeit Oxycodone Pills Containing Fentanyl as "blues" and the Counterfeit Oxycodone Pills Containing Fentanyl are blue in color; and PETTIT described the Counterfeit Oxycodone Pills Containing Fentanyl as "30s,"[10] and the Counterfeit Oxycodone Pills Containing Fentanyl resemble generic 30 milligram oxycodone pills.  Specifically, the size, shape, color and "V" and "48|12" imprints resemble 30 mg oxycodone hydrochloride pills produced by Qualitest Pharmaceuticals, Inc. ("Qualitest"). (A side-by-side photographic comparison of one of the Counterfeit Oxycodone Pills Containing Fentanyl and a Qualitest 30 milligram oxycodone pill is attached as Exhibit A.)

b. **Oxycodone**: The five round blue pills imprinted with "E|8" tested positive for oxycodone, a drug used to treat pain.  I believe that JOHANSSON (through AMADOR) supplied the Oxycodone to McCormick, in part, because JOHANSSON told McCormick that she would provide him with "5 oxy"; "oxy" is an abbreviation for oxycodone; the blue pills imprinted with "E|8" tested positive for oxycodone; and exactly five pills -- *i.e.*, the same number of "oxy" pills JOHANSSON agreed to supply -- were in the bag.  In addition, the oxycodone pills appear identical to the pill in a photograph that JOHANSSON texted McCormick immediately after McCormick requested that JOHANSSON "[s]end me a picture of the oxy."

---

[10] Based on my training and experience, I have come to learn that "30s" -- in the context of prescription opiates -- refers to milligrams of oxycodone.

c.   **Amphetamine**: The ten round orange pills imprinted with "U30" tested positive for amphetamine, a drug used to treat hyperactivity disorders.  I believe that JOHANSSON (through AMADOR) supplied the Amphetamine to McCormick, in part, because JOHANSSON told McCormick that she would provide him with "10 Addy"; "Addy" is an abbreviation for Adderall; the active ingredient in Adderall is amphetamine; the round orange pills imprinted with "U30" tested positive for amphetamine; and ten pills -- i.e., the same number of "Addy" pills JOHANSSON agreed to provide -- were in the bag.

d.   **Hydrocodone**: The five white oval pills imprinted with "G037" tested positive for hydrocodone, a drug used to treat pain.  I believe that JOHANSSON (through AMADOR) supplied the Hydrocodone to McCormick, in part, because JOHANSSON told McCormick that she would provide him with "5 norco"; the active ingredient in Norco (a brand name prescription drug) is hydrocodone; the white oval pills imprinted with "G037" tested positive for hydrocodone; and five pills -- i.e., the same number of "norco" pills JOHANSSON agreed to provide -- were in the bag.

e.   **Xanax**: The 14 white rectangular pills (some of which were broken) tested positive for alprazolam, a drug used to treat anxiety and panic disorders.  I believe that both PETTIT and JOHANSSON (through AMADOR) provided Xanax to McCormick, in part, because PETTIT agreed to provide McCormick with "10 bars"; JOHANSSON told McCormick that she would provide him with "5 bars"; "bars" (as noted above) refers to Xanax; the

19

active ingredient in Xanax is alprazolam; the 14 white
rectangular pills tested positive for alprazolam (and were
imprinted with "XANAX"); the number of white rectangular pills
in the bag was less than 15 (i.e., the aggregate number of Xanax
pills PETTIT and JOHANSSON agreed to provide McCormick) but
greater than ten (the amount PETTIT agreed to provide
individually) and five (the amount JOHANSSON agreed to provide
individually).

**E.  McCormick Consumed the Counterfeit Oxycodone Pills Containing Fentanyl Before His Death**

26.  Shortly after his death, law enforcement discovered a
magazine in an open safe in McCormick's bedroom with blue-
colored powder and multiple indentations visible on its cover.
A rolled piece of paper and a credit card-style gift card were
nearby.  Based on my training and experience, I know that users
sometimes consume oxycodone pills by crushing them on a flat
surface (frequently with a credit card) and snorting the
resulting powder through a straw-like device (frequently rolled
paper or rolled currency).  The presence of powder and
indentations on the magazine, as well as the rolled paper and
gift card nearby, suggest that McCormick crushed and snorted one
or more of the Counterfeit Oxycodone Pills Containing Fentanyl
before his death.

27.  Moreover, the blue color of the powder indicates that
the crushed pills were blue.  As noted above, there were two
types of blue-colored pills in the plastic bag: (1) the
Oxycodone (imprinted with "E|8") that JOHANSSON supplied

(through AMADOR); and (2) the Counterfeit Oxycodone Pills
Containing Fentanyl that PETTIT supplied.  Notably, all ten
Oxycodone pills that JOHANSSON supplied were still present in
the bag.  By contrast, only six of the ten Counterfeit Oxycodone
Pills Containing Fentanyl that PETTIT agreed to provide
McCormick were in the plastic bag.  Accordingly, I believe that
the blue powder came from the Counterfeit Oxycodone Pills
Containing Fentanyl, not the Oxycodone pills.

28.  McCormick's post-mortem toxicology results further
confirm that he consumed the Counterfeit Oxycodone Pills
Containing Fentanyl shortly before his death.  The toxicology
report revealed that McCormick died from mixed drug toxicity
involving fentanyl, cocaine, and ethanol.

**F.  PETTIT's September 8, 2018 Instagram Messages Reacting
to McCormick's Death**

29.  News reports of McCormick's death began circulating on
the afternoon of September 7, 2018.  On the evening of September
7, 2018, PETTIT used his Instagram account "lil.cambam"[11] to
exchange the following direct messages with another Instagram
user ("P.R."):

PETTIT:     "Hi."

P.R.:       "You good?"

PETTIT:     "I am not great."

_____

[11] I believe that the Instagram account "lil.cambam" belongs
to PETTIT, in part, because PETTIT appears in many of the
photographs associated with the account.  In addition, a
shortened version of PETTIT's first name ("Cameron") is included
in the Instagram account name, and the name "Cameron" appears
next to the profile photograph (of PETTIT) on the top of the
Instagram account.

| | |
|---|---|
| P.R.: | "Talk to me" |
| PETTIT: | "Most likely I will die in jail" |
| P.R.: | "I've been worried about you all day" |
| P.R.: | "Don't say that" |
| PETTIT: | "Yeah [frown face emoticon]" |
| PETTIT: | "Dangit" |
| P.R.: | "What do you mean" |
| P.R.: | "You're just paranoid" |
| PETTIT: | "Nothing has happened yet" |
| PETTIT: | "But it might" |
| P.R.: | "Yeah, don't think negatively, ok" |
| PETTIT: | "And I'm nervy" |
| P.R.: | "Babe idk try not to stress I feel like it's going to be ok" |
| P.R.: | "It's not your fault?" |
| PETTIT: | [frown face emoticon] |
| PETTIT: | "I'm gonna get off the grid" |
| PETTIT: | "Move to another country" |
| PETTIT: | "What should my name be" |
| P.R.: | "Are you really" |
| P.R.: | "Like do you honestly think it's that serious" |
| P.R.: | "Your name should be sweet baby dang daddy" |
| P.R.: | "Let's move to Stockholm" |
| PETTIT: | "Yes" |
| PETTIT: | "Ok maybe" |

22

PETTTIT:      "I don't know yet I will probably know
              tomorrow"

P.R.:         "Can you please keep me posted I'm worried
              about you"

P.R.:         "Cam"

PETTIT:       "Yeah"

30.  Within an hour of this direct message exchange, PETTIT
messaged another Instagram user ("A.G.") to ask whether he
should post on his Instagram account a photograph of a text
message exchange between him and McCormick.  PETTIT ultimately
concluded that, "I think I should probably not post anything
. . . just to be smart."

31.  The messages above -- especially those reflecting
PETTIT's belief that he might face substantial criminal exposure
in the wake of McCormick's death ("I am not great  . . . Most
likely I will die in jail") -- provide additional reason to
believe that PETTIT distributed drugs to McCormick shortly
before McCormick's death.

**G.   JOHANSSON Arranged for a Prostitute, AMADOR, to
       Deliver Drugs to McCormick**

32.  As explained above, JOHANSSON arranged for a
prostitute -- whom JOHANSSON referred to as "Carla" -- to
deliver controlled substances to McCormick on September 5, 2018.
For the following reasons, I believe that "Carla" is an alias
for AMADOR and, therefore, that AMADOR is the individual who
delivered controlled substances to McCormick on September 5,
2018.

1.   <u>JOHANSSON Arranged Prostitution Services for
McCormick, Including by Sending "Carla"</u>

33.   Text messages recovered from McCormick's phone reflect
that in late August and early September 2018, JOHANSSON arranged
prostitution services for McCormick on multiple occasions.   On
August 25, 2018, for example, JOHANSSON texted McCormick a
photograph of a blond woman lying on a bed wearing lingerie,
followed by a text message explaining that, "I can do $600 an hr
for the blonde girl."   McCormick responded that he would make a
decision later: "Lemme check the temp of the evening and I'll
hit u."

34.   Approximately two hours later, McCormick texted
JOHANSSON and asked, "anybody available?" leading to the
following text message exchange:

JOHANSSON:   "Yes blonde"

McCormick:   "Lemme see photo again?"

McCormick:   "Different one"

JOHANSSON:   [Photo of blonde woman in red lingerie]

JOHANSSON:   "You want different one ?"

McCormick:   "yes please"

JOHANSSON:   "Carla is available to be there at 4:15"

JOHANSSON:   "But it's 800 an hr"

McCormick:   "Lemme see another photo of this one"

JOHANSSON:   [Photo of blond woman in lingerie]

McCormick:   "She available now"

JOHANSSON:   "Yes"

McCormick:   "Send her overrrr"

     2.   <u>JOHANSSON Texted McCormick a Photograph of</u>
<u>"Carla" on August 29, 2018</u>

    35.  Four days later -- on August 29, 2018 -- the following

exchange occurred between JOHANSSON and McCormick

    McCormick:   "Yooo"

    JOHANSSON:   "What's up hun"

    McCormick   "anybody around?"

    JOHANSSON:   "Yeah Carla and Gia"

    McCormick:   "Gia cheaper right?"

    JOHANSSON:   "Yup lol Gia is $600 an hr and Carla is $800"

    McCormick:   "Yeah can u send Gia over"

    JOHANSSON:   "Sure how many hrs ?"

    McCormick:   "wait..,"

    McCormick:   "Lemme look at both real quick"

    JOHANSSON:   "Do you need to resend pic"

    McCormick:   "Can you resend Carla"

    JOHANSSON:   [Photograph of "Carla"]

    McCormick:   "Can you send Carla?"

    JOHANSSON:   "Sure / how long ?"

    McCormick:   "let's start with 2"

    36.  The photograph of "Carla" that JOHANSSON sent to

McCormick depicts a woman wearing lingerie with her breast

exposed. The woman has distinctive tattoos, including tattoos

on her right arm of a skull with tentacles and another skull

wrapped in flowers (together, the "skull tattoos"). As

discussed below, this photograph depicts AMADOR.

### 3.   "Carla" Visited McCormick on September 5, 2019

37.   As noted above, there is probable cause to believe that "Carla" visited McCormick in the early morning hours of September 5, 2018, shortly after the following text message exchange between McCormick and JOHANSSON occurred:

| | |
|---|---|
| McCormick: | "Cam is supposed to be pullin up and he ain't answering" |
| JOHANSSON: | "I don't know hun" |
| McCormick: | "Is there anybody else wit the shits?" |
| JOHANSSON: | "I can send some with a girl lol" |

. . .

| | |
|---|---|
| McCormick: | "What girls is available?" |
| JOHANSSON: | "Carla is ready" |

. . .

| | |
|---|---|
| McCormick: | "send thruuuu" |

38.   Moreover, as described above, on the afternoon of September 5, 2018, JOHANSSON sent McCormick a text message explaining the cost of Carla's services: "Normally it would have been $3500 for Carla but I'll take it from $700 an hr to $600 an hour."   JOHANSSON's request for payment for Carla's services -- and McCormick's subsequent agreement to pay -- confirms that Carla visited McCormick on September 5, 2018.

4.  <u>KARLA AMADOR Is the True Identity of "Carla" (Who Is Also Known as "Carolina Cortez")</u>

39.  Based on my review of the "friends" list on JOHANSSON's publicly accessible Venmo account,[12] I saw that the list includes an individual named "Carolina Cortez."  A Google search for "Carolina Cortez" reveals that "Carolina Cortez" is an adult film actress.  Tattoos visible on "Carolina Cortez" in pornographic videos -- including the skull tattoos -- appear identical to the tattoos visible in the photograph of "Carla" that JOHANSSON sent to McCormick on August 29, 2018.  Similarly, the Twitter account @CarolinaCortezX (the "Cortez Twitter Account") contains nude and partially nude photographs of a woman with the skull tattoos.  Accordingly, there is reason to believe that "Carla" and "Carolina Cortez" are the same person.

40.  I have viewed the version of the Cortez Twitter Account that was operative on or about July 3, 2019, and saw that it contained a link to Instagram account "karlaamadorx" (the "AMADOR Instagram Account").  The homepage of the AMADOR Instagram Account displays the name "Karla Amador (Carolina)" under a profile photograph of a woman closely resembling the woman in the photograph of "Carla," in which one of the skull tattoos is visible.  Accordingly, I believe that "Carla," "Carolina Cortez" and "Karla Amador" are the same person.

---

[12] I believe this Venmo account belongs to JOHANSSON, in part, because the name of the account is "@Mia-Johansson" and the telephone number linked to the account is the same telephone number used to send and receive the JOHANSSON text messages described in this affidavit.

41.    Moreover, records related to AMADOR's August 2018 arrest in Los Angeles for driving under the influence that I have reviewed indicate that AMADOR has skull tattoos on her arm. Furthermore, I have viewed a booking photograph of AMADOR associated with that arrest and saw that it resembles the individual in the photographs and videos of "Carla" and "Carolina Cortez" described above.

42.    Accordingly, I believe that "Carla" is an alias for AMADOR, and, therefore, as described above, that AMADOR delivered drugs to McCormick at JOHANSSON's direction on September 5, 2018.

**H.    Investigation of the SUBJECT PREMISES and SUBJECT VEHICLES**

1.,  PETTIT'S RESIDENCE

43.    PETTIT'S RESIDENCE is located at 1865 North Fuller Avenue, Apartment 206, Los Angeles, California 90046, in the Westside Habitats Apartments.  I believe that PETTIT presently resides at PETTIT'S RESIDENCE, in part, because a review of law enforcement databases reveals that PETTIT is associated with PETTIT's RESIDENCE; law enforcement has reviewed a 2019 lease agreement for PETTIT'S RESIDENCE, which shows that PETTIT (and another individual) reside at PETTIT'S RESIDENCE; and Global Positioning System ("GPS") location monitoring of PETTIT'S CAR, which is registered to PETTIT (though at a different residence), shows that PETTIT'S CAR is frequently parked in the vicinity of the Westside Habitats Apartments, including as recently as August 9, 2019.

## 2.   PETTIT'S CAR

44.   PETTIT'S CAR is a 2012 Mercedes Benz CLS 550 with
California license plate M002W0 and VIN WDDLJ7DB8CA040491.   I
believe that PETTIT'S CAR is used by PETTIT, in part, because it
is registered to PETTIT.   In addition, GPS location monitoring
of PETTIT'S CAR shows that, on or about August 9, 2019, PETTIT'S
CAR was driven from the vicinity of PETTIT'S RESIDENCE to the
vicinity of the Sayers Club, which PETTIT lists as his place of
work on his Facebook profile page.[13]   Moreover, shortly after GPS
location monitoring of PETTIT'S CAR established that it traveled
from PETTIT'S RESIDENCE to the Sayers Club, law enforcement saw
PETTIT inside the Sayers Club.   Finally, GPS location monitoring
of PETTIT'S CAR indicates that on or about July 28, July 30,
August 3, and August 4, 2019, PETTIT'S CAR traveled to the
vicinity of JOHANSSON'S RESIDENCE.

## 3.   JOHANSSON'S RESIDENCE

45.   JOHANSSON'S RESIDENCE is located at 6300 Variel
Avenue, Apartment 135, Woodland Hills, CA 91367 within the Sofi
Warner Center Apartments.   JOHANSSON is believed to reside at
JOHANSSON'S RESIDENCE (along with one adult and one child), in
part, because a review of law enforcement databases reveals that
JOHANSSON is associated with JOHANSSON'S RESIDENCE; subscriber
information from AT&T for a cellular telephone subscribed to

---

[13] This Facebook account is named "ChefCamBam."   I believe
that the account belongs to PETTIT, in part, because the name
"Cameron James" appears at the top of the profile homepage; and
PETTIT's full name, according to Department of Motor Vehicle
records, is "Cameron James Pettit."   In addition, PETTIT is in
many of the photos associated with this Facebook account.

"Mia P. Johansson" (to and from which the JOHANSSON text messages described above were sent) is registered to JOHANSSON'S RESIDENCE; and leasing records from the Sofi Warner Center Apartments reviewed by law enforcement report that JOHANSSON presently resides at JOHANSSON'S RESIDENCE.

### 4.   JOHANSSON'S CAR

46.   JOHANSSON'S CAR is a 2013 white Mercedes Benz E350 with California license plate 8EQZ173 and VIN WDDHF5KB6DA765958. I believe that JOHANSSON'S CAR belongs to JOHANSSON, in part, because it is registered to JOHANSSON.   In addition, on July 17, 2019, agents saw JOHANSSON'S CAR in the parking structure of the Sofi Warner Center Apartments, the apartment complex containing JOHANSSON'S RESIDENCE.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

47.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.   Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence and vehicles, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their

vehicles in the event of an unexpected opportunity to sell narcotics arises.

      f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles. Drug traffickers are often now using online or application-based payment options for drugs such as Venmo. Records of those transactions are often found in the drug traffickers' digital devices.

      g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence and in their vehicles, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence or in the drug trafficker's vehicles even if the drug trafficker lives with others or shares his cars with others who may be unaware of his criminal activity.

      h.   It is common for drug traffickers and those who participate in prostitution-related crimes to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON PROSTITUTION-RELATED OFFENSES

48. Based on my training and experience and on my conversations with law enforcement officers who investigate prostitution-related crimes, I am aware of the following:

a. Prostitution often involves, in addition to the prostitute, one or more additional people who coordinate schedules, travel, advertising, and payment collection for that prostitute and other prostitutes. Prostitutes and those who manage them often maintain books, receipts, notes, ledgers, bank records, lists of customer information, location data, and other records relating the prostitution services provided. Such records are often maintained in digital devices, in their vehicles, and in their residences.

b. Prostitution also involves communications between customers, the prostitute, and the prostitute's manager, coordinator, "pimp," or "madam." Such communications include telephone calls telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. Because of the nature of prostitution, often photographs and videos are sent and received.

c. Prostitution is often a cash-business, so those involved in prostitution often maintain on hand large amounts of cash representing payments received or to be made. Such cash is often stored in their residences and vehicles. In addition,

payment for prostitution services or to prostitutes are often now made through online or application-based payment options such as Venmo, evidence of which would be found in digital devices.

      d.    It is also common for those who participate in prostitution-related crimes to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and those providing or arranging prostitution-services.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[14]

    49.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

---

    [14] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

51.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PETTIT's, JOHANSSON's, and AMADOR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of PETTIT's, JOHANSSON's, and AMADOR's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

37

52.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VIII.     CONCLUSION

53. For the reasons described above, there is probable cause to believe that PETTIT violated 21 U.S.C. § 841(a)(1). There is also probable cause to believe that the items to be seized described in Attachment B-1 will be found in a search of the premises, vehicle, and person described in Attachments A-1 through A-3, and that the items to be seized described in Attachment B-2 will be found in a search of the premises, vehicle, and persons described in Attachments A-4 through A-7.

/s/

_____
Tommy S. Fung
DEA Special Agent

Subscribed to and sworn before me
this ___30th___ day of August, 2019.

**ALKA SAGAR**
_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT A

**EXHIBIT A**

